IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TEODOLFO SALCEDO-VAZQUEZ, #M21621, <br><br>　　　　　Plaintiff, <br><br>v. <br><br>S. NWAOBASI, E. FUENTES, JOHN/JANE DOE, and WEXFORD HEALTH SOURCES, INC. <br><br>　　　　　Defendants. | Cause No. 13-cv-00606-NJR-DGW |

## AFFIDAVIT OF SAMUEL NWAOBASI, M.D.

I, Samuel Nwaobasi, M.D., hereby state the following under oath:

1. I worked as a physician for Wexford Health Sources, Inc. at Menard Correctional Center from May 4, 2009 through August 2014. I am a medical doctor and I completed a residency in general surgery. I received my medical degree from the University of Lagos in 1972. I have experience treating a variety of conditions. Before I started working for Wexford I practiced as a general surgeon and primary care practitioner for twenty years.

2. I have reviewed Teodolfo Salcedo-Vazquez's medical records from the Illinois Department of Corrections. These are the types of medical records I rely upon when forming my medical conclusions.

3. According to the medical records, Mr. Salcedo-Vazquez arrived at Stateville Northern Reception Center (an intake facility for the Illinois Department of Corrections) in June 2011. Dr. Sylvia Mahone assessed Mr. Salcedo-Vazquez, and noted that he had a sebaceous cyst on his left upper back that was approximately 4-5 inches.

4. Mr. Salcedo-Vazquez transferred to Menard Correctional Center ("Menard")

6519719.1

approximately one week later.

5. When I worked at Menard Correctional Center, on most days there was a staff member working in the health care unit who could translate Spanish.

6. I saw Plaintiff for the first time on July 1, 2011. I noted that he had a tender mass near his left shoulder. He communicated to me that the mass was painful. I examined the mass and noted that it was minimally mobile and I thought it may be attached to his scapula (shoulder blade) muscle. I measured the mass and it was twelve centimeters by ten centimeters. I checked Mr. Salcedo-Vazquez's supraclavicular lymph nodes (lymph nodes near his collarbone) for swelling, to rule out the presence of pathogens (infectious agents) in his body. I ordered an x-ray and ultrasound of his left shoulder and prescribed Motrin (a non-steroidal anti-inflammatory pain medication), 200 milligrams to be taken three times daily. I also ordered a follow-up appointment in 10 days and a complete blood count to determine any abnormalities in Mr. Salcedo-Vazquez's blood cells. Abnormalities in complete blood cell count tests could, among other things, be suggestive of blood loss, blood cell abnormalities, infection, or bone marrow problems, and I wanted to rule out the possibility that the mass on Mr. Salcedo-Vazquez's back was cancerous.

7. When I ordered a follow-up appointment and additional diagnostic testing (e.g., x-rays, ultrasound) for an inmate at Menard Correctional Center, I relied on the correctional officers to bring the inmate back to the health care unit and the other members of the health care staff to arrange for the follow-up appointment or treatment.

8. Mr. Salcedo-Vazquez underwent the complete blood cell count test on July 1, 2011. The results were normal.

9. Mr. Salcedo Vazquez left Menard on a court writ in July 2011. When he returned,

he saw Nurse Practitioner Kimberly Criss on August 4th, 2011. She noted that the ultrasound had not been performed because Mr. Salcedo-Vazquez had been on a court writ. She prescribed more Motrin to Mr. Salcedo-Vazquez and wrote that she would notify the Radiology department that he was back from the court writ.

10. On August 24, 2011, Dr. Fuentes saw Mr. Salcedo-Vazquez. According to her notes, she measured the mass at four inches in length and three inches in width. She noted that he complained of pain and numbness in his left fingers. She also noted that she would confer with another physician about Mr. Salcedo-Vazquez's condition.

11. Mr. Salcedo-Vazquez was seen by a nurse on September 27, 2011. He informed the nurse that mass was getting bigger and it was painful. The nurse referred Mr. Salcedo-Vazquez to the nurse practitioner.

12. Nurse Practitioner Kimberley Criss saw Mr. Salcedo-Vazquez on September 28, 2011. He told her that he felt numbness in his hand and leg. The sensation of numbness can be an indication of pressure effect on the nerve. She prescribed Neurontin to Mr. Salcedo-Vazquez, which is a pain medication that can be used specifically for nerve pain. She also prescribed Indomethacin, which is a non-steroidal anti-inflammatory pain medication.

13. The ultrasound was performed on October 6, 2011. The results of the ultrasound were inconclusive.

14. I treated Mr. Salcedo-Vazquez on October 14, 2011. I noted that he had significant tenderness and pain around the mass. I recommended that he undergo an excision biopsy (where the abnormal tissue is removed) and I also prescribed Ultram, a pain medication used to treat moderate to moderately severe pain. I also ordered a "front cuff permit" for him, which would allow him to be handcuffed in the front, rather than the back, so that handcuffing

did not exacerbate the tenderness around the mass.

15. Mr. Salcedo-Vazquez underwent a punch biopsy on November 22, 2011 at Memorial Hospital in Carbondale, Illinois. A punch biopsy is one where the tissue is removed using a circular blade through deep layers of skin. The tissue removed appeared to be "benign fibroadipose tissue." This means the mass was not cancerous and it consisted of fibrous material and fatty tissue. The tissue was examined by a Pathologist at the University of Illinois Medical Center, whose final diagnosis was that the mass was a lipoma, which refers to a non-cancerous mass composed of fibrous and fatty tissue. At the time of the biopsy, the mass measured approximately 11 centimeters long and 8.5 centimeters wide.

16. I treated Mr. Salcedo-Vazquez the morning after his biopsy. I ordered more Ultram for him to last two months. I noted that his puncture wound (through which the tissue was removed) was dry.

17. Dr. John Shepherd treated Mr. Salcedo-Vazquez on December 14, 2011. Dr. Shepherd noted that since the biopsy, Mr. Salcedo-Vazquez was having difficult climbing on to the top bunk. Dr. Shepherd issued Mr. Salcedo-Vazquez a low-bunk permit, which is a permit that requires him to be assigned to sleep in a lower bunk. Dr. Shepherd also prescribed Tylenol Extra Strength (pain medication) to Mr. Salcedo-Vazquez to take in addition to the Ultram.

18. Dr. Shepherd saw Mr. Salcedo-Vazquez again on January 13, 2012. Mr. Salcedo-Vazquez reported that he was having pain, especially at night. Dr. Shepherd renewed Plaintiff's prescriptions for Tylenol Extra Strength and Ultram, and also ordered Neurontin for him.

19. Dr. Shepherd saw Mr. Salcedo-Vazquez again on April 18, 2012. Dr. Shepherd renewed Mr. Salcedo-Vazquez's pain medication prescriptions.

20. I treated Mr. Salcedo-Vazquez on May 16, 2012. On the occasions where I treated

Mr. Salcedo-Vazquez, we either spoke through a translator or he was able to communicate to me in some English words. I understood that he wanted the lipoma removed and because of my background in general surgery, I had the experience and training to perform simple surgeries that only required local anesthetic, which is a medicine that blocks sensations of pain from a specific area of the body.

21. On May 17, 2012 I removed Mr. Salcedo-Vazquez's lipoma. First, the area around of the mass and surrounding skin was cleansed with alcohol solution. Xylocaine 2% was injected around the mass and surrounding area. Xylocaine 2% is a local anesthetic commonly used for simple surgeries. I removed the lipoma and inserted a Pennrose drain into the wound cavity, which would allow the body fluid to drain and decrease the risk that it would become infected. I stitched the wound and the nurses dressed it with bandages. I ordered that Mr. Salcedo-Vazquez be kept in the health care unit for 23 hours for observation. I ordered that he be given Tylenol with codeine. Codeine is a pain medication that can be used to treat moderate to severe pain.

22. I did not dispense medication to inmates at Menard Correctional Center. When I ordered that an inmate receive a certain medication, I relied on the Health care unit staff to dispense the medication to the inmate. I did not discontinue Mr. Salcedo-Vazquez's Ultram and Neurontin medications following his lipoma removal, nor did any other physician. I simply added another pain medication (Tylenol with codeine) for him to take following the removal of his lipoma. According to the Medication Administration Records, Mr. Salcedo-Vazquez received the Tylenol with codeine, Neurontin, and Ultram in May 2012 following the removal of his lipoma.

23. I discharged Mr. Salcedo-Vazquez from the Health Care Unit on May 18, 2012. I

removed the Pennrose drain and ordered that his dressing be changed.

24. I treated Mr. Salcedo-Vazquez again on May 23, 2012. He complained that his stomach was upset. I saw in the excision site that a pocket of clear serous fluid (called a "seroma") developed. I aspirated (removed) the fluid and the nurses and I applied pressure dressing. I ordered that his pressure dressing be changed every three days for three weeks. I also prescribed Mintox tablets (antacids) to him to treat his upset stomach. There were two reasons for aspirating the fluid. First, fluid can become a reservoir for bacteria, so aspirating reduced the risk of infection. Second, we had to aspirate the fluid to make sure it was not purulent (containing pus), which would be a sign of infection. The fluid that I aspirated from the wound on May 23, 2012 was not purulent.

25. Dr. Shepherd aspirated Mr. Salcedo-Vazquez's wound site on May 29, 2012. He noted that the fluid he aspirated was serosanguinous, which means it contained serum (the clear liquid component of blood, minus the blood cells) and blood but was not purulent.

26. I saw Mr. Salcedo-Vazquez on June 1, 2012. I noted that the incision wound was clean and I aspirated the wound site. The fluid I aspirated was serous (clear) fluid only, indicating the wound was not infected. His pressure dressing was re-applied.

27. I saw Mr. Salcedo-Vaquez on June 8, 2012. All of his stitches were removed. I ordered that his dressing be changed every other day and hydrocortisone cream be applied. The purpose of the hydrocortisone cream was to prevent redness and swelling.

28. I treated Mr. Salcedo-Vazquez on June 20, 2012. I noted that his wound continued to heal. I ordered that his dressing be changed every three days and I would follow up with him in one month.

29. I treated Mr. Salcedo-Vazquez on August 4, 2012. He complained of left shoulder

pain. I prescribed Tylenol, 325 mg to be taken three times daily for the next month and Robaxin, 500 mg to be taken twice daily for the next two months. Robaxin is a muscle relaxant that relieves muscular pain.

30. Nurse Practitioner Rashida Pollion treated Mr. Salcedo-Vazquez on September 21, 2012. He complained of pain and tingling to his left shoulder region. According to Nurse Practitioner Pollion's notes, she examined the area and saw no evidence of drainage (which would be a sign of infection). There was a scar, but the wound had healed. She prescribed Neurontin to him and issued more Tylenol to him.

31. Dr. Shepherd saw Mr. Salcedo-Vazquez on October 17, 2012. Dr. Shepherd prescribed Motrin to him and renewed his front cuff permit.

32. I treated Mr. Salcedo-Vazquez on November 14, 2012. I examined his left shoulder area. The wound had healed. There was no swelling or redness. I renewed Mr. Salcedo-Vazquez's Motrin prescription and Tylenol prescription.

_____
Samuel Nwaobasi, M.D.

Subscribed and sworn to before me this 27TH day of August, 2015.

_____
Notary Public

My Commission Expires:

06-14-2017

STEPHEN CRAIG MORROW
Notary Public-Notary Seal
State of Missouri, St Louis County
Commission # 13452753
My Commission Expires Jun 14, 2017

6519719.1