IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TEODOLFO SALCEDO-VAZQUEZ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 13-CV-606-NJR-DGW |
| ) | |
| SAMUEL NWAOBASI and ) | |
| WEXFORD HEALTH SOURCES, INC., ) | |
| ) | |
| Defendants. ) | |

## **MEMORANDUM AND ORDER**

**ROSENSTENGEL, District Judge:**

Plaintiff Teodolfo Salcedo-Vazquez an inmate housed at Menard Correctional Center ("Menard"), filed a Complaint June 24, 2013, pursuant to 42 U.S.C. §1983 alleging that Dr. Samuel Nwaobasi, Wexford Health Sources, Inc. ("Wexford"), and several others were deliberately indifferent to a serious medical need in violation of the Eighth Amendment. In particular, Plaintiff alleges that Dr. Nwaobasi and others failed to properly treat a mass on his left shoulder beginning in June 2011. After the Complaint was screened pursuant to 28 U.S.C. §1915A, Plaintiff was permitted to proceed on three counts alleging violations of the Eighth Amendment's prohibition against cruel and unusual punishment against Dr. Nwaobasi and Wexford:

1) Dr. Nwaobasi and Wexford were deliberately indifferent to Plaintiff's serious medical needs (pre-operation) between June 2011 and May 2012 (Count 1);

2) In May 2012, Dr. Nwaobasi was deliberately indifferent to Plaintiff's serious medical needs when performing an operation to remove the growth from Plaintiff's shoulder (Count 2); and

3) Wexford was deliberately indifferent to Plaintiff's serious medical needs when it failed to give Plaintiff medication prescribed after his operation (Count 3).

(Doc. 7). Counsel was appointed to represent Plaintiff on October 10, 2013 (Doc. 28).

On August 21, 2015, Dr. Nwaobasi and Wexford filed a Motion for Summary Judgment on Counts 1, 2, and 3, which is currently before the Court (Doc. 74). Plaintiff filed a response in opposition to the motion for summary judgment (Doc. 78), and Defendants filed a reply (Doc. 80). The Court has carefully considered the briefs and all of the evidence submitted by the parties, and for the reasons set forth below, the Motion is granted in part and denied in part.

## BACKGROUND

Defendant Wexford Health Sources, Inc. ("Wexford") is a private corporation that contracts with the Illinois Department of Corrections ("IDOC") to provide medical services to inmates detained in IDOC facilities. At all times relevant to this lawsuit, Defendant Samuel Nwaobasi was employed by Wexford as a physician at Menard Correctional Center ("Menard"). Plaintiff was transferred from Stateville Correctional Center to Menard sometime in June 2011 (Doc. 76, pp. 1–2). The following facts detail Plaintiff's numerous complaints and health care visits regarding the mass in the year after he arrived at Menard.

It should first be noted that Plaintiff does not know how to speak or read English proficiently (Doc. 75-1, p. 4). Plaintiff testified at his deposition, however, that he was

able to understand "signs," and it appears that he could understand basic English (*Id.* at pp. 7, 8). But Plaintiff does not know enough English to "maintain conversation" (*Id.* at p. 8). According to Plaintiff, a translator was never present at any of his medical appointments. Conversely, Dr. Nwaobasi contends that on most days, there was a staff member in the health care unit who could translate Spanish (Doc. 76, p. 2). He further contends that he either spoke to Plaintiff through a translator or that Plaintiff was "able to communicate to me in some English words" (*Id.* at p. 4).

Medical records from Menard reveal that immediately prior to his transfer, Plaintiff complained about the mass on his shoulder to the medical staff at Stateville. Specifically, Plaintiff said that the mass was "hurting [him] too much every day" and "the pain is uncontrollable" (Doc. 44-3, p. 2). On July 1, 2011, shortly after Plaintiff arrived at Menard, he was examined by Dr. Nwaobasi (Doc. 75-2, p. 2). The doctor measured the mass on Plaintiff's left shoulder, and it was ten centimeters by twelve centimeters (*Id.*). The doctor also noted that the mass was tender and caused pain when Plaintiff moved his arm (*Id.*). Dr. Nwaobasi ordered a number of diagnostic tests, including an x-ray, an ultrasound, and lab work (*Id.*). He also prescribed Motrin to be taken three times daily for pain (*Id.*).

The lab work was performed that same day, and it came back "normal" (i.e. non-cancerous) (*Id.* at p. 3; Doc. 76, p. 2). There is no indication the x-ray was ever scheduled. There is also no evidence that the Motrin was given to Plaintiff as prescribed; instead, it appears that he only received it once on July 26th and perhaps twice on July 27th (*see* Doc. 78-1, p. 1). As for the ultrasound, it appears that it was

scheduled but not performed because Plaintiff was temporarily transferred out of Menard on July 27th on a court writ (*see* Doc. 75-2, p. 4; *see also* Doc. 75-1, p. 5; Doc. 78-1, p. 1).

At any rate, Plaintiff was back at Menard by August 4, 2011, and complaining of pain from the mass (Doc. 75-2, p. 4). He was prescribed another thirty-day supply of Motrin, but once again, there is no evidence that he was ever given the Motrin as prescribed (*see* Doc. 78-1). Approximately three weeks later, on August 24, 2011, Plaintiff saw Dr. Fe Fuentes and complained of pain and numbness in his left fingers (Doc. 75-2, p. 5; Doc. 76, p. 3). Dr. Fuentes noted that she would confer with another physician about Plaintiff's condition (Doc. 75-2, p. 5; Doc. 76, p. 3). There is no indication, however, that any action was taken or that Plaintiff was given any additional pain medication.

On September 23rd, Plaintiff saw a nurse and complained that he was in pain. He rated his pain as a "10/10" and indicated that the Motrin was not effective (Doc. 78-2, p. 1). Plaintiff was referred to a doctor (*Id.*). Four days later, on September 27th, Plaintiff saw another nurse and informed her that the mass was getting bigger and he was still in pain (Doc. 75-2, p. 6; Doc. 76, p. 3). Again, the nurse referred Plaintiff to a doctor (Doc. 75-2, p. 6).

On September 28th, Plaintiff saw nurse practitioner Kimberly Criss (Doc. 75-2, pp. 6–7; Doc. 76, p. 3). Plaintiff told Criss that he was having pain into his head and his hand and leg were going numb (Doc. 75-2, p. 6). Criss noted that Plaintiff had decreased range of motion, decreased strength, and decreased grip is in his left arm (*Id.*). She

further noted that x-ray had been contacted as well as the outside provider who performs the ultrasounds (*Id.*). She prescribed Neurontin, which is a pain medication specifically for nerve damage, and Indomethacin, which is a non-steroidal anti-inflammatory pain medication (*Id.*; Doc. 76, p. 3). The Neurontin was dispensed to Plaintiff as prescribed, almost without exception, for the next three months (*see* Doc. 78-1, pp. 3, 4, 6). He was not, however, given the Indomethacin as prescribed (Doc. 78-1, p. 2). The Court cannot tell for certain, but it looks like Plaintiff received the Indomethacin on only one day (September 30th) (*Id.*).

On October 6th, the x-ray and ultrasound were finally performed (Doc. 75-2, pp. 7–8). The ultrasound revealed a solid mass near Plaintiff's left shoulder blade, but the nature of the mass could not be determined (*Id.* at p. 8). A week after the ultrasound, Plaintiff complained to the medical staff that he was in severe pain and requested to see a doctor (*Id.* at p. 9; *see also* Doc. 44-3, pp. 5–6). He saw Dr. Nwaobasi the next day (Doc. 75-2, p. 10). The doctor noted that the mass was "extremely tender" and "severe[ly] painful" (*Id.*). He prescribed a ten-day supply of Ultram, a pain medication used to treat moderate to moderately severe pain, recommended an excision biopsy to determine the nature of the mass, and ordered a front-cuff permit for Plaintiff (*Id.* at pp. 9–10; Doc. 76, p. 3). Dr. Nwaobasi also ordered a follow-up appointment in two weeks (Doc. 75-2, p. 9), which means the pain medication that he prescribed would not last Plaintiff until the follow-up appointment. Nevertheless, the records indicate that Plaintiff was given the Ultram on one day only (October 19th) (Doc. 78-1, p. 5). And at the follow-up appointment on November 2nd, Dr. Nwaobasi did not prescribe any more pain

medication for Plaintiff (*see* Doc. 78-1, pp. 5–6; Doc. 78-2, p. 2).

On October 20th, it was noted in the medical records that a biopsy of the mass had been approved by Wexford (Doc. 78-2, p. 2). On October 26th, an appointment for the biopsy was scheduled (*Id.*). The biopsy was performed on November 22nd at Memorial Hospital in Carbondale, Illinois (Doc. 75-2, pp. 11–12). A pathologist at the University of Illinois Medical Center examined the tissue that was removed and diagnosed the mass as a lipoma, which is a non-cancerous mass composed of fibrous and fatty tissue (*Id.* at p. 13; Doc. 76, p. 4). At the time of the biopsy, the mass measured approximately eleven centimeters long and eight and one-half centimeters wide (Doc. 75-2, p. 13; Doc. 76, p. 4). Following the biopsy, Plaintiff was given Motrin for pain (Doc. 78-1, p. 6).

The morning after the biopsy, Dr. Nwaobasi saw Plaintiff (Doc. 75-2, p. 14; Doc. 76, p. 4). Dr. Nwaobasi examined the biopsy site (Doc. 75-2, p. 14). He also prescribed Plaintiff a two-month supply of Ultram to be taken twice a day (Doc. 75-2, p. 14; Doc. 76, p. 4). The records indicate that the Ultram was dispensed as prescribed through December 14th, when Plaintiff saw Dr. John Shepherd for a follow-up visit (Doc. 78-1, pp. 6–7; Doc. 75-2, p. 15). Plaintiff complained to Dr. Shepherd that he was having difficulty climbing to the top bunk, so the doctor issued him a low-bunk permit (Doc. 75-2, p. 15). Dr. Shepherd also prescribed extra strength Tylenol for Plaintiff to take, in addition to the Ultram, when he had breakthrough pain (*Id.*). Dr. Shepherd also requested a surgical evaluation to have the "grapefruit sized" mass removed (Doc. 78-2, pp. 3–4). Wexford denied that request (*Id.*).

The records indicate that the Ultram was dispensed as prescribed through January 13, 2012, when Plaintiff saw Dr. Shepherd for a follow-up appointment (*Id.* at p. 16). But he was never given any Tylenol (*see* Doc. 78-1, pp. 7–9). Plaintiff complained to Dr. Shepherd that he was still in pain, especially at night (*Id.*). Dr. Shepherd renewed Plaintiff's prescriptions for extra strength Tylenol, Ultram, and Neurontin for the next three months (*Id.*). The records indicate that Plaintiff received the Ultram and Neurontin as prescribed, but he was given Tylenol only once on January 16th (Doc. 78-1, pp. 9–14).

Following the January 13th appointment, Dr. Shepherd again attempted to get approval for a surgical evaluation (Doc. 78-2, p. 5). Wexford denied the request, stating it wanted "to get pics of mass or set up telemed time to evaluate." (*Id.*). On March 9, 2012, Plaintiff was seen in the TeleClinic by Dr. Paul (*Id.* at p. 6). Dr. Paul noted that the mass was now larger than it was in October 2011—it grew one centimeter in width to fourteen centimeters; it grew one centimeter in height to twelve centimeters; and its depth was seven centimeters from the skin surface (*Id.*). In spite of the fact the mass was the size of a grapefruit, Dr. Paul recommended continuing to monitor the mass to see if it grew any larger (*Id.*). Consequently, the request for a surgical evaluation was denied for the third time (*Id.*).

Plaintiff saw Dr. Shepherd for a follow-up visit on April 18, 2012, which was five days after his prescriptions expired (Doc. 75-2, p. 17; Doc. 78-1, p. 13). Dr. Shepherd gave Plaintiff another three-month supply of his medications and ordered a follow-up visit in one month (Doc. 75-2, p. 17). It is unclear whether Plaintiff received his

prescriptions as prescribed for the remainder of April because there is no medication administration record for that month (*see* Doc. 78-1). Throughout the month of May, Plaintiff received the Neurontin and Ultram as prescribed, but only received the Tylenol on perhaps two days (*Id.* at pp. 15–17).

On May 16, 2012, Plaintiff saw Dr. Nwaobasi for the follow-up visit (Doc. 75-2, p. 18). The medical records indicate that the mass would be removed under local anesthesia (*Id.*). The next day, Dr. Nwaobasi removed the mass (*Id.*). Dr. Nwaobasi describes cleaning the area with alcohol solution and then injecting Xylocaine 2%, which he describes as "a local anesthetic commonly used for simple surgeries," around the mass and surrounding area (Doc. 76, p. 5). Dr. Nwaobasi then explains that he removed the lipoma, inserted a Pennrose drain into the wound cavity, and stitched the wound (*Id.*). A nurse then dressed the wound with bandages (*Id.*). Plaintiff was kept in the health care unit for twenty three hours for observation and given Tylenol with codeine for the next five days for pain (*Id.*; *see also* Doc. 75-2, p. 18; Doc. 78-1, pp. 15, 17).

In juxtaposition to Dr. Nwaobasi's prosaic description of the surgery, Plaintiff offers a much more lurid picture. Plaintiff testified at his deposition that he was never told that he was going to have surgery on May 17, 2012 (Doc. 75-1, p. 7). He claimed that he was told to lie down on a table, and the doctor started giving him an injection (*Id.*). Plaintiff was held down by four people to keep him from moving (*Id.*). The doctor pressed on his back and asked Plaintiff if he could feel it, and Plaintiff said "yes" (*Id.*). But Dr. Nwaobasi started cutting anyway (*Id.*). He asked the doctor to stop, but the doctor refused (*Id.*). Plaintiff said he "was in a lot of pain," sweating profusely ("my

whole body was just sweating, sweating, sweating, just covered in water"), and "for a second I lost sense of what was going on" (*Id.*). According to Plaintiff, Dr. Nwaobasi showed him the tumor and told him to "Go take it with you. Go put it in soup. Go cook it up" (*Id.*).[1] He then was taken to a room that was "incredibly, incredibly dirty, just horrible" (*Id*). He said he was "in a lot of pain" and "covered in blood," and he was given some unknown pain medication (*Id.*).

The day after the surgery, Dr. Nwaobasi saw Plaintiff (Doc. 75-2, p. 19). The drain was removed, the wound dressing was changed, and Plaintiff was discharged (*Id.*). Shortly thereafter, fluid began to build up around the wound, and it had to be aspirated on a number of occasions in the weeks following the surgery (*see id.* at pp. 20–22; Doc. 78-2, p. 11). Plaintiff continued to complain about severe pain in his left shoulder for months following the removal of the lipoma (*see* Doc. 75-2, pp. 22–27).

## DISCUSSION

**A. LEGAL STANDARD FOR SUMMARY JUDGMENT**

The standard applied to summary judgment motions under Federal Rule of Civil Procedure 56 is well-settled and has been succinctly stated as follows:

> Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

---

[1] There was no Spanish translator present on the day of the surgery (*Doc. 75-1, p. 7*). When asked how he knew what Doctor Nwaobasi said to him, Plaintiff explained:
    A. It's easy to understand like someone says to you, there you are, here it is, and go take it with you and eat it, and the people around start laughing.
    Q. So you heard him say in English, put this in your soup?
    A. Exactly, not just him, also the people who were there.
    Q: You can translate the phrase, put this in your soup, from English to Spanish?
    A: Put it in your noodle and eat.
(Doc. 75-1, p. 7).

> moving party is entitled to a judgment as a matter of law. In determining whether a genuine issue of material fact exists, [the Court] must view the record in a light most favorable to the nonmoving party. Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the nonmovant may not rest on the pleadings but must respond, with affidavits or otherwise, setting forth specific facts showing that there is a genuine issue for trial . . . . A mere scintilla of evidence in support of the nonmovant's position is insufficient; a party will be successful in opposing summary judgment only when it presents definite, competent evidence to rebut the motion.

*Albiero v. City of Kankakee*, 246 F.3d 927, 931-32 (7th Cir. 2001) (citations and quotations omitted). No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).

**B. DELIBERATE INDIFFERENCE AGAINST DR. SAMUEL NWAOBASI**

Plaintiff contends that Dr. Nwaobasi was deliberately indifferent to his medical condition prior to May 17, 2012, when the lipoma was removed, and also during the surgical removal of the lipoma.

In order to prevail on a claim for deliberate indifference to a serious medical need, there are "two high hurdles, which every inmate-plaintiff must clear." *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 590 (7th Cir. 1999). First, the plaintiff must demonstrate that his medical condition was "objectively, sufficiently serious." *Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005) (citations and quotation marks omitted). Second, the plaintiff must demonstrate that the "prison officials acted with a sufficiently culpable state of mind," namely deliberate indifference. *Id.* at 653.

Dr. Nwaobasi does not contest the first prong of the deliberate indifference analysis—a serious medical condition (*see* Doc. 75). Thus, the issue presented by the summary judgment motion is whether Dr. Nwaobasi's conduct with respect to the treatment and removal of the lipoma constituted deliberate indifference.

Deliberate indifference "requires more than negligence and it approaches intentional wrongdoing." *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012); *accord Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("Deliberate indifference is intentional or reckless conduct, not mere negligence."); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[N]egligence, even gross negligence does not violate the Constitution.") A prison official acts with deliberate indifference if he or she knows of a serious risk to the prisoner's health and responds ineffectually or not at all. *Holloway*, 700 F.3d at 1073. Put differently, the prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "must also draw the inference." *Greeno*, 414 F.3d at 653 (citation omitted).

In the context of medical professionals, the deliberate indifference standard has been described as the "professional judgment" standard. *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008). Under this standard, in order for a prison medical professional to be held liable for deliberate indifference, his or her treatment decisions must be "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Sain*, 512 F.3d at 895. In other words, a prison medical professional is "entitled to deference in treatment decisions unless no minimally competent

professional would have so responded under those circumstances." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Sain*, 512 F.3d at 894–95). *See also Holloway*, 700 F.3d at 1073 ("There is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field." (quoting *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008))).

When it comes to delays in providing effective medical treatment, the delay can constitute deliberate indifference if it unnecessarily prolonged an inmate's pain. *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). "[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012) (quoting *McGowan*, 612 F.3d at 640). "Even a few days' delay in addressing a severely painful but readily treatable condition suffices to state a claim of deliberate indifference." *Smith*, 666 F.3d at 1040.

### 1. Actions Prior to Surgery on May 17, 2012

With respect to Dr. Nwaobasi's conduct prior to the surgery, Plaintiff claims that the doctor failed to provide him with medications or treatment that adequately addressed the pain from his lipoma. Dr. Nwaobasi contends that he is entitled to summary judgment on this claim because he was not deliberately indifferent to Plaintiff's serious medical need.

The Court is unpersuaded by Dr. Nwaobasi's argument. It is indisputable that Dr. Nwaobasi evaluated Plaintiff multiple times, ordered an xray and an ultrasound, referred Plaintiff for a biopsy, and ultimately removed the lipoma. But the fact that

Plaintiff received *some* medical attention does not foreclose his deliberate indifference claim. *Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011). He can still prevail if Dr. Nwaobasi's response was blatantly inappropriate in the face of his pain and the likelihood that his condition was worsening. *Id.*

As Dr. Nwaobasi acknowledged, many of the diagnostic tests that he ordered were delayed (Doc. 75, p. 10). For example, the x-ray and ultrasound were not performed until approximately four months after Plaintiff arrived at Menard and three months after they were initially ordered. And it took another month and a half for the biopsy to be performed. The Court will not simply assume that those delays were out of the control of Dr. Nwaobasi. He has to provide some evidence of that, such as the dates on which he submitted the requests for the procedures to Wexford, the dates on which Wexford approved the procedures, and the dates on which the appointments for the procedures were scheduled. But Dr. Nwaobasi provided nothing.

The evidence also shows that Plaintiff was in serious pain during the periods of delay. The first time Dr. Nwaobasi saw Plaintiff on July 1, 2011, he prescribed 200 mg of Motrin for Plaintiff's pain. A reasonable jury could find the doctor's decision to prescribe small doses of over-the-counter medications to address severe pain was not in accordance with accepted professional judgment, practice, or standards. By the second visit on October 14th, Plaintiff was regularly taking Neurontin, but he was still complaining of severe pain.[2] Dr. Nwaobasi prescribed Ultram, but he did not give

---

[2] Neurontin is not effective for routine or non-neuropathic pain. *Gabapentin (Oral Route)*, MAYO CLINIC, http://www.mayoclinic.org/drugs-supplements/gabapentin-oral-route/description/drg-20064011 (last visited Nov. 16, 2015).

Plaintiff enough to last him until his next appointment. And at the next appointment on November 2nd, Dr. Nwaobasi prescribed nothing. That means, despite Plaintiff's undisputed severe pain, Dr. Nwaobasi left him without anything but Neurontin, which did little to nothing to alleviate his pain, for over a month. Viewing all of the evidence in a light most favorable to Plaintiff, a reasonable jury could infer that Dr. Nwaobasi substantially departed from professional judgment by delaying diagnostic testing and failing to provide Plaintiff with effective pain medication. Dr. Nwaobasi's request for summary judgment on Count 1 is denied.

### 2. Actions During Surgery on May 17, 2012

With respect to the excision surgery, Plaintiff first claims that Dr. Nwaobasi was deliberately indifferent because the doctor did not inform Plaintiff of the nature of the surgery, the risks, or the benefits and because he never was provided an interpreter to translate any information from English to Spanish. Some circuits have recognized that "prisoners have a constitutional right to information . . . as is reasonably necessary to make a rational decision to accept or reject proposed medical treatment." *Benson v. Terhune,* 304 F.3d 874, 884–85 (9th Cir. 2002) (citing *White v. Napoleon,* 897 F.2d 103, 113 (3d Cir. 1990)). *See also Pabon v. Wright,* 459 F.3d 241, 249–50 (2d Cir. 2006) ("[A] doctor simply must provide a prisoner with such information as a reasonable patient would find necessary to making an informed decision regarding treatment options."). The Seventh Circuit has not commented on the standard set forth by those circuits. *See Phillips v. Wexford Health Sources, Inc.,* 522 Fed.Appx. 364, 367 (7th Cir. 2013); *Cox v. Brubaker,* 558 Fed.Appx. 677, 679 (7th Cir. 2014). But it noted that it has "adopted a

general rule that is consistent with these circuits: The Eighth Amendment protects inmates from deliberate indifference to *substantial* risks of serious damage to their health." *Phillips*, 522 Fed.Appx. at 367. In other words, the failure to provide inmates with information regarding a particular medical treatment or procedure can constitute deliberate indifference if the risks associated with the treatment or procedure are "substantial enough that a reasonable patient would expect to be apprised of them." *Id.*

The Court thinks it is rather obvious that a reasonable patient would want to know the specifics of a procedure to remove a grapefruit-sized mass from his shoulder blade. According to Plaintiff, Dr. Nwaobasi did not provide him with those specifics. A close reading of Plaintiff's deposition reveals a level of confusion as to the nature of the surgery and follow-up care that could have been alleviated had the procedure been explained to Plaintiff in Spanish. Consequently, the Court is suspect that the doctor had Plaintiff's informed consent to perform the surgery.

Plaintiff also claims Dr. Nwaobasi was deliberately indifferent during the surgery because the local anesthetic that was used failed to adequately numb the area, and his distress and efforts to request more anesthetic *in the middle of surgery* were literally ignored. Plaintiff also contends that immediately after the surgery, he was shown his lipoma and openly mocked—a horrible episode, if it occurred. The gratuitous infliction of pain, perhaps because of the apparent language barrier, could lead a reasonable jury to conclude that Dr. Nwaobasi was deliberately indifferent in performing surgery. Accordingly, Dr. Nwaobasi's request for summary judgment on Count 2 is denied.

**C. DELIBERATE INDIFFERENCE AGAINST WEXFORD HEALTH SOURCES, INC.**

Plaintiff also claims that Wexford, as a corporation, was deliberately indifferent to his serious medical needs before and after the lipoma-removal surgery by depriving him of his medications and adequate medical care.

Under controlling precedent, a private corporation that contracts to provide essential government services can be held liable under § 1983, but not under a theory of *respondeat superior*. *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 1024 (2015). The corporation can only be held liable if "the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself." *Id.*; *see also Monell v. Dep't of Social Serv. of N.Y.C.*, 436 U.S. 658 (1978). Therefore, in order to recover against Wexford, Plaintiff must offer evidence that "his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy." *Shields*, 746 F.3d at 796.

Here, Plaintiff is arguing that an unofficial, but widespread, custom or practice caused his injury. In particular, Plaintiff claims that prior to the removal of his lipoma, there was a pattern of delay in scheduling appointments and testing, delays or arbitrary refusals to dispense medication as prescribed, and indifference or disdain regarding the communication barrier between himself and the medical staff. Plaintiff further claims that the refusal to dispense medication as prescribed continued following the surgery.

With respect Plaintiff's post-surgery claim, the evidence before the Court demonstrates this claim is meritless. At the time of his lipoma removal, Plaintiff was

receiving Neurontin and Ultram (*see* Doc. 78-1, pp. 15, 17). On top of that, Dr. Nwaobasi prescribed a five-day supply of Tylenol with codeine following the surgery (*Id.*; Doc. 75-2, p. 18). The Medication Administration Record reveals that Plaintiff received all three medications as prescribed (Doc. 78-1, pp. 15–17). Accordingly, Wexford is entitled to summary judgment on Count 3.

When it comes to delays in scheduling appointments and testing prior to the lipoma-removal surgery, Plaintiff points to the fact it took three months to have an x-ray and ultrasound and eleven months to have the lipoma removed (*see* Doc. 78, p. 14). But two instances over the course of nearly one year do not add up to a pattern of behavior that would support an inference of an unconstitutional custom or policy. *See Thomas v. Cook County. Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010) ("[T]here is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, except that it must be more than one instance. . . or even three.") (internal citations and quotation marks omitted); *Palmer v. Marion County*, 327 F.3d 588, 596 (7th Cir. 2003) ("proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference").

It is a different story, however, with respect to the failure to dispense medications as prescribed prior to the surgery. In July 2011, Plaintiff received a thirty-day prescription for Motrin; he received it twice, at most (Doc. 75-2, p. 2; Doc. 78-1, p. 1). In August 2011, Plaintiff received another thirty-day prescription for Motrin; he did not receive it a single day (Doc. 75-2, p. 4; *see* Doc. 78-1). In September 2011, Plaintiff received prescriptions for Neurontin and Indomethacin; the Neurontin was dispensed

as prescribed, but he received the Indomethacin perhaps once (Doc. 75-2, p. 6; Doc. 78-1, pp. 2, 3, 4, 6). In October 2011, Plaintiff received a ten-day prescription for Ultram; he received it once (Doc. 75-2, p. 10; Doc. 78-1, p. 5). And from late October to late November, Plaintiff was not prescribed anything other than Neurontin for his pain. It is clear that the Neurontin was ineffective as Plaintiff regularly took it, but nevertheless continued to complain of serious pain. In other words, for the first five months that Plaintiff was at Menard, he almost never received the pain medication that he was prescribed. Thus, Plaintiff has presented evidence from which a reasonable jury could conclude that there was a widespread practice that went on for months of failing to properly dispense medications, and that practice caused Plaintiff to suffer unnecessary pain.

Finally, regarding the communication barrier between himself and the medical staff at Menard, Plaintiff testified that there was never a translator present at his medical appointments. He further testified that he never knew what his course of treatment was or what medications he was prescribed. And during his medical visits, the doctors, including Dr. Nwaobasi, and other personnel mostly dismissed him, discouraged him from trying to communicate, and did not listen to him. Plaintiff claims that as a result of his inability to meaningfully communicate with the medical providers at Menard, he was forced to endure months of ineffective medical care and unnecessary pain. If a jury believes Plaintiff's version of events, the jury could easily conclude that there was a widespread, long-standing practice of deliberate indifference to prisoner's medical needs by ignoring the language barriers between prisoners and medical staff.

For these reasons, Wexford is not entitled to summary judgment on Count 1.

## CONCLUSION

For the reasons set forth above, the Motion for Summary Judgment (Doc. 65) is **GRANTED in part and DENIED in part.** Summary Judgment is **GRANTED** in favor of Defendant Wexford Health Sources, Inc. on Count 3. Summary Judgment is **DENIED** as to Counts 1 and 2.

A final pretrial conference will be held at **9 a.m.** on **Monday, November 23, 2015**. Jury trial will commence at **9 a.m.** on **Tuesday, December 1, 2015**.

IT IS SO ORDERED.

DATED:   November 16, 2015

s/ Nancy J. Rosenstengel  
**NANCY J. ROSENSTENGEL**  
**United States District Judge**